1  MARY SUE WILSON
   Sr. Assistant Attorney General
2  ANDREW A. FITZ
   Senior Counsel
3  LEE OVERTON
   DOROTHY H. JAFFE
4  Assistant Attorneys General
   Ecology Division
5  P.O. Box 40117
   Olympia, WA  98504-0117
6  (360) 586-6770
   *Attorneys for Plaintiff*

7

8

9

10           **UNITED STATES DISTRICT COURT**
             **EASTERN DISTRICT OF WASHINGTON**
11

12  STATE OF WASHINGTON,              NO. 2:08-cv-05085-FVS

13                   Plaintiff,       PLAINTIFF STATE OF
                                      WASHINGTON'S
        and                           PETITION TO AMEND
14                                    CONSENT DECREE

    STATE OF OREGON,
15
                 Plaintiff-Intervenor,   Hearing Date Requested
16
             v.                       Oral Argument Requested
17
    ERNEST MONIZ, Secretary of
18  the United States Department of
    Energy, and the UNITED
19  STATES DEPARTMENT OF
    ENERGY,
20
                     Defendants.
21

22

# TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................1

II.   BACKGROUND ....................................................................5

      A.  Hanford's Tank Waste Mission .........................................5

          1.  Tank Waste Storage ...............................................6

          2.  Tank Waste Treatment ...........................................10

      B.  History of Actions Under the Hanford Federal Facility
          Agreement and Consent Order ........................................13

      C.  2008 Lawsuit and 2010 Settlement ..................................17

      D.  Events Since Entry of 2010 Decree .................................21

          1.  Notices of Consent Decree Requirements "at Risk"; Limited
              Information Provided to State; Energy Appears to Have
              Already Decided to Move on New Path That Will Not
              Comply With Consent Decree ....................................21

          2.  August 2012:  State Threatens Formal Action .................24

          3.  New Tank Issues ................................................28

              a)  DST AY-102 Out of Service Due to Internal Leak .........29

              b)  At Least One SST Identified With Active Leak to
                  Surrounding Soils .........................................30

III.  REASONS FOR THE STATE'S REQUEST FOR RELIEF ......................30

      A.  The Events Since the Consent Decree Was Entered Demonstrate
          That the Decree Requires More Specificity, Accountability, and
          Enforceability ......................................................32

          1.  Energy's WTP Problems Have Continued Since Entry of the
              2010 Consent Decree ...........................................32

WASHINGTON'S PETITION TO AMEND
CONSENT DECREE

i

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
(360) 586-6770

2.   The Events Since Entry of the 2010 Consent Decree Show Gaps in the Decree's Terms...............................................................37

B.   The Consent Decree Must Include Mitigation for WTP Delays in Order to Maintain the Benefit of the Bargain Provided by the 2010 Decree...........................................................................................42

IV.   REQUEST FOR RELIEF .................................................................44

A.   Amendment Process Under the Consent Decree ....................................44

B.   Legal Standard for Consent Decree Amendment ..................................47

C.   Portions of the State's March 31, 2014 Amendment Proposal That Should be Adopted Into the Consent Decree................................50

1.   New WTP Schedule...........................................................................50

2.   Continued SST Retrievals..................................................................51

3.   Additional Accountability Measures ...............................................54

V.   CONCLUSION ................................................................................56

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
(360) 586-6770

1               **TABLE OF ACRONYMS**

2     DFLAW – Direct Feed Low Activity Waste Facility

3     DOE – Department of Energy

4     DST – Double-Shell Tank

5     HFFACO – Hanford Federal Facility Agreement and Consent Order

6     HLW – High Level Waste

7     HWMA – Hazardous Waste Management Act (Washington State)

8     RCRA – Resource Conservation and Recovery Act (federal)

9     SST – Single-Shell Tank

10    WAC – Washington Administrative Code

11    WTP – Waste Treatment Plant

12

13

14

15

16

17

18

19

20

21

22

## I.    INTRODUCTION

In 2008, the State of Washington (Washington, or State) filed suit in this Court to remedy missed and certain-to-be missed milestones for cleanup of the Hanford Nuclear Reservation.   The milestones were for the United States Department of Energy (Energy) to: (1) by 2011, build and begin operating a treatment plant to convert into glass Hanford's millions of gallons of high-level radioactive and hazardous tank waste, much of which is stored in aging, leak-prone single-shell tanks; (2) by 2018, finish retrieving waste from all 149 of those single-shell tanks; and (3) by 2028, finish treating all of the tank waste. The suit sought to re-establish an enforceable legal schedule for these tasks, which had come so far off track that Energy no longer held itself accountable to the schedule in place.

In 2010, this Court entered a Consent Decree resolving the suit between Washington and defendant Energy.  The Consent Decree was part of a broader settlement that put under this Court's jurisdiction nearer-term deadlines to finish the treatment plant and retrieve 19 single-shell tanks, while establishing new, longer-term deadlines in the Hanford Federal Facility Agreement and Consent Order (HFFACO, also known as the "Tri-Party Agreement") for retrieving all the remaining single-shell tanks and treating all the tank waste. Even the "nearer-term" Consent Decree deadlines were a decade's leap from the previous deadlines under the HFFACO.   Under the current Decree, the treatment plant (known as the Waste Treatment Plant, or WTP) is to begin

WASHINGTON'S PETITION TO AMEND
CONSENT DECREE

1

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
(360) 586-6770

1   operating in 2019 and reach full-scale "initial operations" by 2022, with the

2   19 tanks to be retrieved during the same period.  The new "end dates" under the

3   HFFACO marked an even greater leap:  Energy is to finish retrieving waste

4   from all single-shell tanks no later than 2040, and finish treating all of

5   Hanford's tank waste no later than 2047.  These dates were established based

6   on Energy's modeling of the rate at which SSTs could be retrieved and waste

7   could be treated assuming the requirements of the Decree were met (i.e., that

8   the WTP would begin operating in 2019 and reach full-scale "initial operations"

9   by 2022).

10       In November 2011, less than 13 months after this Court entered the

11   Consent Decree, Energy gave notice to the State that certain unspecified

12   Consent Decree deadlines were "at risk."  After five months of argument over

13   whether the information would be subject to Federal Rule of Evidence 408,

14   Energy finally identified to the State the specific "at risk" deadlines.  The

15   deadlines included both the 2019 and 2022 dates for WTP hot start and

16   achieving initial operations, as well as a number of deadlines related to the

17   portions of the WTP dedicated to "pre-treating" tank waste and converting the

18   most highly radioactive fraction of the waste into glass.

19       Over the nearly three years since, Energy abandoned all efforts to comply

20   with the remaining WTP-related deadlines in the 2010 Consent Decree.  It is

21   now impossible for Energy to comply with these deadlines.  During the past

22

WASHINGTON'S PETITION TO AMEND
CONSENT DECREE

2

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
(360) 586-6770

1    three years, Energy and its WTP contractor have again proceeded without being

2    accountable to the schedule in place, without consultation with this Court, and

3    with almost no consultation with the State, to define a new approach for

4    completing and operating the WTP.  This approach will add yet another decade

5    or more of projected delay to the WTP.  In the meantime, without an operating

6    WTP, Energy cannot continue retrieving waste from the SSTs unless, as

7    mitigation, additional new, compliant storage capacity is built.  This means that

8    without such mitigation, the benefit of the bargain the State was promised under

9    the 2010 Consent Decree—which included putting Energy on course to retrieve

10   all 149 SSTs by no later than 2040—is lost.

11          By early 2014, Energy had still not presented the State with a proposal to

12   amend the Consent Decree, despite having given notice of missed deadlines

13   more than two years earlier.  On March 31, 2014, pursuant to Consent Decree

14   Sections VII.G and X.C, the State provided Energy with the State's own

15   proposal to amend the Decree.  Energy rejected the State's amendment proposal

16   on April 18, 2014.  On April 25, 2014, under the terms of Consent Decree

17   Section IX.A, the State triggered a 40-day dispute resolution period over

18   Energy's rejection.  Upon motion of the parties, this Court extended the dispute

19   resolution period twice to September 5, 2014.  The State and Energy were

20   unable to resolve their dispute during this extended dispute resolution period.

21

22

WASHINGTON'S PETITION TO AMEND
CONSENT DECREE

3

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
(360) 586-6770

1        Pursuant to Federal Rule of Civil Procedure 60(b)(5) and Section IX.B of

2    the Consent Decree, the State now petitions the Court to resolve the amendment

3    dispute between the State and Energy.  The State requests that the Court adopt

4    into the Decree three main elements of the State's March 31 proposal.  The first

5    element is a new schedule for completing construction of the WTP and bringing

6    the WTP into initial operation.  The State's proposed schedule adopts the same

7    basic phased approach for completing construction and start-up of the WTP

8    advanced by Energy in a September 2013 framework document.  The proposed

9    schedule is realistic and achievable, but with sufficient specificity to foster

10   accountability and timely identify future schedule risk issues.

11       The second element consists of two actions to mitigate for Energy's WTP

12   delays.  These actions are to: (1) continue retrieving waste from non-compliant

13   SSTs while start-up of the WTP is delayed; and (2) construct additional

14   compliant tank storage capacity to allow these retrievals to move forward even

15   without a fully operating WTP.  These actions are necessary to maintain the

16   same benefit of the bargain afforded by the 2010 Decree with respect to tank

17   retrievals, despite the WTP delays.  Completing the SST retrieval mission on

18   the current HFFACO schedule is more essential than ever.  Even under the

19   current schedule, some SSTs may be nearly a century old by the time they are

20   retrieved, as compared to their intended 20-30 year design life.  Since the 2010

21   Decree was entered, there is evidence that at least one, and possibly more, SSTs

22

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
(360) 586-6770

1    are actively leaking.  The likelihood of further deterioration and leakage in the

2    SST system will only increase with time.

3         Finally, the third element consists of additional Consent Decree terms to

4    ensure greater accountability and enforceability in the Decree in light of the

5    circumstances leading to the current state of non-compliance.  These terms are

6    to: (1) provide quarterly progress reports to the State and the Court; (2) provide

7    a recovery plan, with a schedule, to the State and the Court, upon Energy

8    identifying any future schedule risk(s); and (3) provide to the State and the

9    Court an annual report identifying for each of the upcoming seven federal fiscal

10    years, the funding needed to achieve compliance with all court-ordered

11    requirements.  These terms are necessary to help avoid a repeat of the current

12    situation.

13         Under Consent Decree Section IX.B, this petition is timely brought

14    within 30 days of the conclusion of the extended dispute resolution period.

15                              **II.    BACKGROUND**

16    **A.    Hanford's Tank Waste Mission**

17         From 1944 to 1989, the federal government produced approximately two-

18    thirds of the nation's weapons-useable plutonium at Hanford.  Declaration of

19    Suzanne Dahl-Crumpler (Dahl Decl.) ¶ 13.  This activity generated highly

20

21

22

WASHINGTON'S PETITION TO AMEND
CONSENT DECREE                                    5                    ATTORNEY GENERAL OF WASHINGTON
                                                                                              Ecology Division
                                                                                              PO Box 40117
                                                                                          Olympia, WA 98504-0117
                                                                                             (360) 586-6770

1    radioactive and chemically hazardous waste as a byproduct.  Dahl Decl. ¶¶ 11-

2    13.  Today there are approximately 56 million gallons of this legacy waste

3    remaining at Hanford.[1]  Dahl Decl. ¶ 14.

4         Throughout Hanford's production period, and still to this day, the federal

5    government has lacked the capability to treat this waste into a form safe for

6    ultimate disposal.  Dahl Decl. ¶¶ 21-23.  As a result, the waste—which is now

7    in various forms of liquid, sludge, and "saltcake"—continues to be stored in

8    177 temporary underground holding tanks at the center of the Hanford site.

9    Dahl Decl. ¶¶ 14-15.  Hanford's tank waste mission centers on retrieving this

10   waste from its temporary storage and treating it for ultimate disposal.  Dahl

11   Decl. ¶¶ 20-22.

12        **1.    Tank Waste Storage**

13        Most of Hanford's tanks—149 out of the 177—are "single-shell tanks"

14   (SSTs) that consist of a single welded carbon steel liner (the tank), encased

15   within a concrete shell for structural support.  Declaration of Jeffery Lyon

16   _____

17        [1] The hazardous waste portion of this mixture is subject to regulation

18   under Washington's Hazardous Waste Management Act, chapter 70.105 RCW,

19   through authorization under the federal Resource Conservation and Recovery

20   Act (RCRA).  *See Washington v. Moniz*, 558 F.3d 1036, 1038 (9th Cir. 2009)

21   (discussing Washington's federal authorization to implement the HWMA in

22   lieu of RCRA).

WASHINGTON'S PETITION TO AMEND
CONSENT DECREE                                      6                    ATTORNEY GENERAL OF WASHINGTON
                                                                                    Ecology Division
                                                                                    PO Box 40117
                                                                              Olympia, WA 98504-0117
                                                                                   (360) 586-6770

1   (Lyon Decl.) ¶¶ 7-8.  The oldest were built in 1944.  The newest was built in

2   1964.  The tanks range in capacity from approximately 55,000 gallons to over

3   1 million gallons.  Lyon Decl. ¶ 8.  Today, the SSTs still hold approximately

4   29 million gallons of waste, much of which is of a sludge-like consistency.

5   Lyon Decl. ¶ 7.  Most of the easily pumped liquid waste has been removed from

6   the SSTs so that much of the remaining waste is composed of sludges and

7   solids.  Any one SST, however, may still hold tens of thousands of gallons of

8   liquid in interstitial space within the sludges.  Lyon Decl. ¶ 16.

9        Under normal conditions, each SST was expected to only operate for an

10  approximately 20 to 30-year "design life."  The older tanks, however, have now

11  been storing waste for some 70 years (40 to 50 years beyond their design lives)

12  and even the newest tanks have now been storing waste for 50 years (20 to

13  30 years beyond their design lives).  Further, most SSTs have not operated

14  under "normal" conditions.  Instead, they have been subjected to severe

15  operating conditions due to factors such as caustic waste composition and

16  extreme heat generated by tank contents.  Lyon Decl. ¶ 9.  Not surprisingly,

17  waste has already escaped to the environment from nearly half of the SSTs (67

18  out of 149).  Among these, at least 25 SSTs have reported breaches in the sides

19  or bottoms of their carbon steel liners.  This has caused tank waste to leak

20  directly to the surrounding soil.  There is insufficient information on which to

21  project by how much or at what rate any given SST will further deteriorate over

22

WASHINGTON'S PETITION TO AMEND
CONSENT DECREE
7
ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
(360) 586-6770

1    a specific period.  However, it is indisputable that the likelihood of further

2    deterioration and leakage will increase with time.  Lyon Decl. ¶ 10.

3         Present estimates are that approximately one million gallons of tank

4    waste have been released to the environment from the SSTs.  This waste

5    includes hazardous waste constituents such as chromium, numerous other heavy

6    metals, and volatile organic compounds, all of which are harmful to human

7    health or the environment.  In addition, the tank waste contains highly

8    radioactive, long-lived radionuclides that, once released, will persist in the

9    environment for tens of thousands of years.[2]  Lyon Decl. ¶ 11.  Despite

10   Energy's initial assurances that any leakage would remain in soil beneath the

11   tanks, in November 1997, Energy confirmed that contamination from the tanks

12   had reached groundwater more than 200 feet below the surface.  This

13   groundwater eventually discharges to the Columbia River, which is about five

14   to eight miles from the location of the tank farms.  Lyon Decl. ¶ 12.

15        In regulatory terms, none of the SSTs meet applicable requirements for

16   hazardous waste storage tanks under the federal Resource Conservation and

17   Recovery Act (RCRA) and Washington's Hazardous Waste Management Act

18   _____

19        [2] Although these radionuclides are not "solid waste" under RCRA and are

20   not regulated by the State, see 42 U.S.C. § 6903(27); *United States v. Manning*,

21   527 F.3d 828, 832-33 (9th Cir. 2008), they are inextricably bound in the same

22   waste mixture as the hazardous constituents subject to State regulation.

WASHINGTON'S PETITION TO AMEND
CONSENT DECREE                                        8                    ATTORNEY GENERAL OF WASHINGTON
                                                                                Ecology Division
                                                                                PO Box 40117
                                                                             Olympia, WA 98504-0117
                                                                                (360) 586-6770

1    (HWMA).  Specifically, the SSTs lack structural integrity; they lack secondary

2    containment; and they lack leak detection as required by 40 C.F.R.

3    § 265.193(a)(3), (b), and (c) (incorporated by reference in WAC 173-303-

4    400(3)[3]).  Lyon Decl. ¶ 13.  Further, all 149 SSTs have been identified to the

5    State as "unfit for use" through an engineering assessment conducted by

6    Energy.  Lyon Decl. ¶ 14, Ex. 4.  This unfit-for-use determination triggers a

7    legal obligation on Energy's part under RCRA and the HWMA to

8    "immediately" remove the tank from service; to, within "24 hours . . . or, if the

9    owner or operator demonstrates that it is not possible, at the earliest practicable

10   time," remove as much waste as is necessary to prevent release to the

11   environment; and to "close" the tank system pursuant to state hazardous waste

12   management standards if the system is not upgraded or repaired to meet

13   minimum standards.  Lyon Decl. ¶ 15.  *See* 40 C.F.R. § 265.196(a), (b).

14        The remaining 28 Hanford tanks are newer, approximately one million

15   gallon capacity "double-shell tanks" (DSTs) intended by Energy to provide

16   compliant storage.  Lyon Decl. ¶ 19.  These tanks are constructed of two welded

_____

18        [3] For simplicity, all succeeding citations to federal C.F.R. hazardous

19   waste tank system requirements as incorporated into Washington's Dangerous

20   Waste Regulations will simply be to the C.F.R.  In all cases, the federal

21   requirements are incorporated into state regulation through WAC 173-303-

22   400(3).

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
(360) 586-6770

1    steel liners (tanks), one of which is enclosed within the other to provide

2    "secondary containment" in the event of a leak from the primary tank.  Both

3    tanks are enclosed within exterior concrete for structural support.  Lyon Decl.

4    ¶ 20.  As further explained below, one DST—Tank AY-102—has recently

5    developed a leak and must be removed from service.  Lyon Decl. ¶ 21.

6         Hanford's DSTs are currently storing nearly 27 million gallons of waste.

7    Lyon Decl. ¶ 7.  There is only limited available DST space to allow for the

8    further transfer of waste from the SST system, as well as the transfer of waste

9    out of DST Tank AY-102.  Without the construction of more DSTs or the

10   availability of treatment capacity for Hanford's tank waste, no further

11   significant transfer of waste can occur into the DST system from the aging and

12   unfit SSTs.  Lyon Decl. ¶ 24.

13        **2.    Tank Waste Treatment**

14        Independent of the "safe storage" requirements that require SST closure,

15   all of Hanford's tank waste is "land disposal restricted" under RCRA and the

16   HWMA.  Dahl Decl. ¶ 18.  Such waste must be treated to specified standards

17   before it can be disposed of.  *Id.*  Significant to this matter, such waste also

18   cannot be stored for any longer than is necessary to accumulate "such

19   quantities . . . as are necessary to facilitate proper recovery, treatment or

20   disposal."  42 U.S.C. § 6924(j); 40 C.F.R. § 268.50 (incorporated by reference

21   in WAC 173-303-140(2)(b)); *see also Washington v. Moniz*, 558 F.3d 1036,

22

WASHINGTON'S PETITION TO AMEND
CONSENT DECREE

10

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
(360) 586-6770

1    1038-40 (9th Cir. 2009).  This "storage prohibition" is aimed at preventing the

2    indefinite accumulation of waste in lieu of treatment.  *Moniz*, 558 F.3d at 1040.

3    As a result, even when stored in the DSTs, Hanford's tank waste is being stored

4    in violation of the storage prohibition and must be treated to land disposal

5    restriction standards.

6        As indicated above, there is still no treatment capacity for Hanford's tank

7    waste.  Since at least 1989, Energy's plan has been to build a Waste Treatment

8    Plant (WTP) to "vitrify" the waste into glass logs.  Dahl Decl. ¶ 21.  In the

9    simplest terms, the WTP will consist of four major components—the

10   Pretreatment Facility, the Low Activity Waste Vitrification Facility, the High

11   Level Waste Vitrification Facility, and the Analytical Laboratory—together with

12   supporting facilities.[4]  Dahl Decl. ¶ 24.  The Pretreatment Facility will separate

13   incoming tank waste into two fractions:  a low-activity waste fraction and a high-

14   level waste fraction.  Dahl Decl. ¶ 25.  Each waste stream will then be routed to a

15   respective vitrification facility (Low Activity Waste Facility or High Level Waste

16   Facility) for immobilization.  Dahl Decl. ¶ 25-27.  After the waste is treated, the

17   WTP will produce two output streams.  Dahl Decl. ¶ 29.  The bulk of the

18   chemicals and some of the radioactive elements will be captured in the

19   —————————————

20       [4] These facilities are often referred to by the following acronyms:

21   Pretreatment Facility (PT or PTF); Low Activity Waste Facility (LAW); High

22   Level Waste Facility (HLW); and Analytical Laboratory (LAB).

1   low-activity fraction (10 percent of the radioactivity and 90 percent of the

2   volume) and vitrified as Immobilized Low Activity Waste.  Dahl Decl. ¶ 29.

3   This waste will be disposed of on the Hanford site at the Integrated Disposal

4   Facility.  *Id.*  The remaining high-level radioactive fraction (90 percent of the

5   radionuclides and 10 percent of the volume) will be vitrified as Immobilized

6   High Level Waste.  Dahl Decl. ¶ 30.  This waste will presumptively be disposed

7   of at a national deep geologic repository, currently designated by Congress to be

8   located at Yucca Mountain, Nevada.  *See In re Aiken Cnty.*, 725 F.3d 255 (D.C.

9   Cir. 2013).

10          In addition to allowing Energy to address its storage prohibition

11  violation, the WTP has also been Energy's primary solution for removing waste

12  from the SST system, thus allowing it to be closed.  Dahl Decl. ¶ 21-22.  Energy

13  has expected that over time, waste fed through the WTP from the DST system

14  will free up DST capacity, which in turn will allow for the continued transfer of

15  waste retrieved from the SSTs to the DSTs.  Dahl Decl. ¶ 21.  Under this

16  strategy, the WTP is the lynchpin for completing the Hanford tank waste

17  mission.  Dahl Decl. ¶ 22.  To this point, the WTP has been viewed as vital to

18  both treating tank waste in satisfaction of RCRA/HWMA treatment standards

19  and creating the "throughput" necessary to allow SSTs to continue being

20  retrieved.  Dahl Decl. ¶ 22.

21

22

WASHINGTON'S PETITION TO AMEND
CONSENT DECREE

12

1  **B.    History of Actions Under the Hanford Federal Facility Agreement
and Consent Order**

2         In order to address Hanford's numerous compliance issues, the State, the

3  Environmental Protection Agency, and Energy entered into the HFFACO in

4  1989.  Hedges Decl. ¶ 9.  Among other things, the HFFACO is a compliance

5  order issued pursuant to RCRA and HWMA.  HFFACO Article I *available at*

6  http://www.hanford.gov/?page=81.    The  HFFACO  establishes  numerous

7  milestones (schedules and associated regulatory requirements) for cleanup of the

8  Hanford site and for bringing Hanford facilities into compliance with applicable

9  environmental requirements.  Hedges Decl. ¶ 9.

10        The milestones established in the original 1989 HFFACO included

11  milestones to address the treatment and prolonged storage of high-level tank

12  waste.  Under these milestones, Energy was to have completed the treatment of

13  all tank waste by 2028.  Energy was also to have completed the "retrieval" of

14  waste from all 149 SSTs by 2018, with the benchmark for retrieval set at the

15  equivalent of 99 percent of capacity of each SST.  Hedges Decl. ¶ 10, Ex. 1.  This

16  action was to allow for closure of the unfit-for-use SST system by 2024.  Finally,

17  to mitigate the near-term risk posed by continued SST storage, the HFFACO

18  (and later, a consent decree) required Energy to "interim stabilize" certain SSTs

19

20

21

22

13

1    prior to full-scale retrieval by removing "pumpable liquids" from the tanks and

2    transferring those liquids to the DSTs.[5]  Hedges Decl. ¶ 10.

3        In order to support SST waste retrievals and complete tank waste

4    treatment, Energy committed in 1989 to build a pilot WTP that would begin

5    treating tank waste by 1999.  Dahl Decl. ¶ 31.  Five years later (1994), on the

6    promise that the vitrification strategy would be expanded beyond a pilot to

7    include all of Hanford's tank waste, this start date was renegotiated and

8    extended to 2004.  Dahl Decl. ¶ 32.  Just two years after this renegotiation

9    (1996), Energy adopted a "privatization" concept for building and operating the

10   _____

11       [5] As indicated earlier, interim stabilization does not mean that all liquids

12   have been removed from the SSTs, or that the risk of further leaks from the SSTs

13   to the environment has been eliminated.  Rather, it means that Energy has left no

14   more than 50,000 gallons of interstitial liquids and no more than 5,000 gallons of

15   readily pumpable (supernatant) liquids in a subject tank.  While the SST waste

16   volume is now mostly made up of sludge (and some solids), any one SST may

17   still hold tens of thousands of gallons of liquid occupying interstitial space within

18   the sludge.  Lyon Decl. ¶ 16.  In 1999, Washington and Energy resolved a

19   threatened lawsuit over Energy's failure to meet the HFFACO interim

20   stabilization milestones by entering into a consent decree.  *Washington v. U.S.*

21   *Dep't of Energy*, CT-99-5076-EFS (E.D. Wash, 1999).  Energy completed the

22   requirements of this decree in 2010 and the decree was dismissed in 2011.

WASHINGTON'S PETITION TO AMEND
CONSENT DECREE                           14                 ATTORNEY GENERAL OF WASHINGTON
                                                                        Ecology Division
                                                                        PO Box 40117
                                                                   Olympia, WA 98504-0117
                                                                        (360) 586-6770

1    vitrification complex.  Accommodating this change, the State agreed to extend

2    the milestone for starting full-scale WTP operations to 2008.  Dahl Decl. ¶ 33.

3         In 2000, after Energy abandoned its privatization plan, the State agreed to

4    yet another request from Energy to extend the WTP milestones.  This time, the

5    start date for full-scale WTP operations was extended to 2011.[6]  Dahl Decl.

6    ¶ 34.

7         Construction on the WTP began in July 2002.  Dahl Decl. ¶ 35.  The

8    project was beset with problems almost from the start.  *Id.*  As concluded by

9    numerous federal studies and reports, the majority of factors contributing to

10   these problems were within Energy's control: poor project management; poor

11   contractor oversight; failure to plan for, and then promptly address, seismic

12   issues identified as early as 2002; and failure to recognize and resolve key

13   technical issues, which particularly affected the Pretreatment and High Level

14   Waste Facilities.  Dahl Decl. ¶¶ 35-36; *see also* Dahl Decl. ¶¶ 38, Ex. 1; 39,

15   Ex. 2; 53, Ex. 11; 54, Ex. 12; 75, Ex. 20; 76, Ex. 21; 80, Ex. 24; 84, Ex. 27.[7]

16   ───────────────

17        [6] In addition, in 2003, the State agreed to allow Energy to move forward

18   with testing alternative waste form technologies to supplement Waste

19   Treatment Plant capacity, as a possible alternative to constructing a second low-

20   activity waste vitrification facility.

21        [7] The Declaration of Suzanne Dahl presents a detailed overview of

22   Energy's project management, contractor oversight, and technical issue

1    These key technical issues included the potential for hydrogen gas to build to

2    explosive levels in vessels and piping, as well as a series of interrelated issues

3    related to waste mixing vessels in both facilities.  Dahl Decl. ¶ 35.

4           Because of the highly radioactive nature of the waste involved, the

5    mixing vessels were designed to be located in "black cell" rooms that will never

6    be accessed after the facility begins operating.  Dahl Decl. ¶ 63, Ex. 19 at App.

7    C.  As a result, once operations begin, it will be impossible to perform any

8    maintenance or repair of the vessels during the 40-year design life of the WTP.

9    *Id.*  As early as 2002, Energy and its WTP contractor, Bechtel National, Inc.

10    (Bechtel), were warned that their design did not provide an adequate margin of

11    safety for the wear and tear (erosion) and corrosion that will occur in the mixing

12    vessels during the WTP's lifespan.  Dahl Decl. ¶¶ 66, Ex. 15, Table 1 at 5-8; 75,

13    Ex. 20 at 2; 76, Ex. 21 at 1.  In addition, while the vessels were designed to use

14    "pulse jets" to maintain mixing instead of moving parts that will wear out, the

15    design adequacy of the pulse jets was questioned in light of some of the waste

16    characteristics (which include non-Newtonian fluids).  Dahl Decl. ¶ 67, Ex. 15

17    at 12-14.  Between 2002 and 2009, Energy took some steps to respond to these

18    issues, but its efforts were never sufficient to eliminate questions stemming

19

20    _____

21    resolution failures, both pre- and post-2010 Consent Decree.  *See generally,*

22    Dahl Decl. ¶¶ 31-90.

WASHINGTON'S PETITION TO AMEND
CONSENT DECREE                                    16                    ATTORNEY GENERAL OF WASHINGTON
                                                                              Ecology Division
                                                                              PO Box 40117
                                                                              Olympia, WA 98504-0117
                                                                              (360) 586-6770

1    from the initial design shortcomings since full scale testing was never done.

2    Dahl Decl. ¶¶ 66-73, Exs. 15, 19, 24.

3        As a result of Energy's actions and inaction, the WTP project soon fell

4    years behind schedule and billions of dollars over budget.  Dahl Decl. ¶¶ 23, 35,

5    36.  By 2006, it was clear Energy would be unable to meet any of its HFFACO

6    WTP construction or tank waste treatment milestones.

7        On the retrieval side, despite the HFFACO requirement to complete all

8    SST waste retrievals by 2018, Energy did not complete its first tank retrieval

9    until 2003.  Three years later, Energy missed its first major HFFACO retrieval

10   milestone, which was to complete retrieval of the grouping of SSTs that make up

11   the "C-Farm."  *See* ECF No. 1 ¶ 33.  By the 2006 milestone date, Energy had

12   retrieved only two of the 16 SSTs in the grouping.

13       In short, by 2006 it was clear Energy would be unable to meet any of its

14   pending tank waste treatment, retrieval, or closure milestones under the

15   HFFACO.  From 2006 to 2008, the State negotiated with Energy and the

16   Department of Justice over a prospective new tank waste mission schedule.

17   This negotiation did not result in an agreement.  Hedges Decl. ¶ 12.

18   **C.**    **2008 Lawsuit and 2010 Settlement**

19       In November 2008, the State filed suit over Energy's missed and certain

20   to be missed HFFACO WTP construction, tank waste treatment, SST retrieval,

21   and SST closure milestones.  Hedges Decl. ¶ 13.  Among other things, the

22

WASHINGTON'S PETITION TO AMEND
CONSENT DECREE

17

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
(360) 586-6770

1    State's complaint alleged that Energy had not: (1) immediately removed

2    leaking and/or unfit-for-use SSTs from service as required by 40 C.F.R.

3    § 265.196; (2) within 24 hours after detection of a leak or, if removal within

4    24 hours is not possible, at the earliest practicable time, removed as much of the

5    waste from the SSTs as is necessary to prevent further release of hazardous

6    waste to the environment, as required under 40 C.F.R. § 265.196(b)(1); and

7    (3) closed the leaking and/or unfit-for-use tank system as required under

8    40 C.F.R. § 265.196(e)(1), in lieu of providing secondary containment and

9    repair to the SSTs.   It also alleged that Energy was storing land disposal

10   restricted waste in violation of the storage prohibition under 40 C.F.R. § 268.50

11   (incorporated by reference in WAC 173-303-140(2)(b)).  ECF No. 1 ¶ 21.

12        In August 2009, the parties agreed to a proposed settlement package that

13   included new compliance schedules for satisfying the legal requirements

14   outlined in the State's suit. The package was split between two legal

15   instruments—part of it in a judicial consent decree, and part of it in

16   amendments to the HFFACO—which were submitted for concurrent public

17   comment.  Hedges Decl. ¶ 14.  The Consent Decree (which was entered by this

18   Court in November 2010) defined new milestones for WTP construction and

19   "hot start" (to be completed by the end of 2019), WTP initial operations (to be

20   attained by the end of 2022), and 19 SST retrievals (to be completed by the end

21   of 2022).   The 19 SST retrievals in the Decree were negotiated based on

22

1   Energy's modeling as to how many retrievals it could accomplish before the

2   WTP came on-line (filling remaining available DST capacity).    Hedges Decl.

3   ¶ 15.

4          Among other things, the HFFACO amendments (which were executed

5   concurrent with Decree entry) established a schedule for further SST retrievals

6   beyond the Decree, a new "end date" milestone for completing all SST retrievals,

7   and a new "end date" milestone for completing all tank waste treatment.

8   Specifically, all SST retrievals were to be completed no later than the end of

9   2040 and all tank waste treatment was to be completed no later than the end of

10  2047.  Hedges Decl. ¶ 16.  These "end dates" were negotiated based on Energy's

11  modeling of the rate at which SST retrievals could be maintained and tank waste

12  could be treated after the WTP came on-line.  Hedges Decl. ¶ 17, Ex. 2 at 4-5, 6.

13  This link between the 2010 Consent Decree schedule and the 2010 amended

14  HFFACO schedules was recognized in a joint State-Energy responsiveness

15  summary to public comment:

16         Recognizing that getting the WTP constructed and operational is an
           integral part of the entire tank waste mission, the Parties selected a
17         settlement approach that maintained the connection between WTP
           construction and operation and SST retrievals and requires:  (1) that
18         USDOE remains on schedule to meet the new SST retrieval
           schedule; (2) that USDOE remains on schedule to meet the new
19         WTP construction and operation schedule; and (3) contingency
           measures to address various risks including tank integrity.
20
           The State determined that it could agree to the schedule and pace of
21         SST retrievals *given its expectations that USDOE will remain on*

22

1    *track* to meet the SST retrieval and WTP construction and operation
2    schedule *and there will be no new or increased risk of tank failure*.

Hedges Decl., Ex. 2 at 5 (emphasis added).

3
4         In tandem with establishing new "end date" milestones, Ecology and

5    Energy agreed to an ongoing "System Plan" process to model and evaluate how

6    the retrieval and tank waste treatment missions could be conducted more

7    efficiently (and ideally, more quickly than the "no later than" end dates).  Hedges

8    Decl. ¶¶ 18, 19.  Periodic future negotiations were scheduled around specific

9    System Plan runs.  Hedges Decl. ¶ 19.  In addition, the System Plan was to

10   identify and include contingency measures that anticipated (among other matters)

11   the possibility of further WTP construction delays, insufficient DST space to

12   support continued retrievals on schedule, and SST integrity issues.  Hedges Decl.

13   ¶ 20, Ex. 3 at D-26 to D-27.  According to the settlement language, these

14   contingency measures "should include . . . providing new, compliant tanks with

15   sufficient capacity and in sufficient time to complete retrievals under this

16   agreement [i.e., no later than 2040] . . . ."  Hedges Decl. ¶ 21, Ex. 3 at D-27; *see*

17   *also* Hedges Decl., Ex. 2 at 5.  Thus, building additional DST capacity was

18   contemplated as a response to potential further WTP delays, insufficient DST

19   capacity, and SST integrity issues.

20

21

22

D.    **Events Since Entry of 2010 Decree**

1.    **Notices of Consent Decree Requirements "at Risk"; Limited Information Provided to State; Energy Appears to Have Already Decided to Move on New Path That Will Not Comply With Consent Decree**

In November 2011, just 13 months after the Consent Decree became effective, Energy (through the Department of Justice) gave Washington notice that one or more of the Decree milestones was "at risk." Declaration of Andrew Fitz (Fitz Decl.), Ex. 1. Between November 2011 and May 2012, the State repeatedly asked for details regarding the specific requirements at risk, the reasons why Energy believed the deadlines were at risk, and Energy's efforts to address these developments. *See* Fitz Decl., Exs. 2, 3, 4, 5. Energy refused to provide the information unless the State agreed the information would be received subject to Federal Rule of Evidence 408.[8] *See* Fitz Decl., Ex. 4.

On May 4, 2012, after taking an "agree to disagree" approach to the applicability of Federal Rule of Evidence 408, the two sides met in-person. Energy officials orally confirmed they believed ten Consent Decree milestones were at risk, virtually all upcoming milestones for completing construction and

---

[8]Washington maintains that a meeting scheduled for the purpose of Energy providing to the State the factual and technical reasons for determining it has a serious schedule risk is a meeting concerning Energy's compliance with an order of the Court, and as such is not governed by Federal Rule of Evidence 408. Fitz Decl., Exs. 4, 5.

WASHINGTON'S PETITION TO AMEND
CONSENT DECREE

21

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
(360) 586-6770

1    achieving operations of High Level Waste Facility, Pretreatment Facility, and full

2    WTP (A-1, A-2, A-3, A-4, A-13, A-14, A-15, A-16, A-17, and A-19).  Hedges

3    Decl. ¶ 28.  Energy represented that no other milestones were at risk, including

4    those related to retrievals.  *See* Fitz Decl., Ex. 6.  Both at and following this

5    meeting, Washington expressed concern with Energy's approach to the situation,

6    including Energy's failure to provide specific details to the State.

7        Energy explained that its schedule risk determination was related at least

8    in part to technical issues associated with pulse-jet mixers, erosion and

9    corrosion in Pretreatment Facility vessels, and documented safety analysis.

10    Hedges Decl. ¶ 28.  In addition to blaming these technical issues, Energy

11    officials, in 2012 and in 2013, also indicated that funding was having and would

12    likely in the future have some impact on Energy's ability to comply with

13    Consent Decree requirements.  Hedges Decl. ¶ 29.  When describing the role of

14    past funding shortfalls and projected future funding constraints on Energy's

15    ability to comply, Energy has not provided detailed budget information on the

16    individual facilities in order to provide a clear distinction between the relative

17    roles of funding and technical issues in delays.  *Id.*

18        The State questioned Energy's February 2012 direction to its contractor,

19    Bechtel, to develop a new Waste Treatment Plant baseline that assumed

20    (1) annual funding caps and (2) that resolution of technical issues related to the

21    Pretreatment and High Level Waste Facilities was only possible if the schedule

22

WASHINGTON'S PETITION TO AMEND
CONSENT DECREE

22

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
(360) 586-6770

1    for those facilities was extended.  Hedges Decl. ¶ 27.  This meant that as early as

2    February 2012, Energy was planning not to meet or comply with certain Consent

3    Decree requirements, despite having sought no concurrence from the State or

4    approval from the Court.

5          Following the May 4 meeting, Washington officials asked that Energy take

6    several actions by June 13, 2012, including providing details regarding "other

7    information" giving rise to the schedule risk (to which Energy officials vaguely

8    alluded during the May 4 meeting) and committing to secure the State's

9    concurrence before making future requests of its contractors that implicated

10   Consent Decree compliance.  The State also asked Energy to direct Bechtel to

11   prepare an alternative baseline that did not assume funding limitations and was

12   designed to meet, or come as close as possible to meeting, all Consent Decree

13   requirements.  Hedges Decl. ¶ 30.

14         This last request was based on the State's understanding of the Consent

15   Decree's "good cause" requirement for schedule amendment. Under the

16   Decree, "good cause" exists when the Decree schedule cannot be met due to

17   circumstances and events unanticipated in the development of the schedule, or

18   circumstances anticipated in the development of the schedule, but which have a

19   greater impact on the schedule than predicted or assumed at the time of the

20   schedule.  Consent Decree § VII.D.1.  "Good cause" does not exist if Energy

21   can nonetheless meet the existing schedule by responding with reasonable

22

1   diligence to such circumstances or events.  *Id*.  "Good cause" also does not exist

2   if Energy could have met the existing schedule if it had responded with

3   reasonable diligence to the circumstance(s) and event(s) when they occurred.

4   *Id*.  State officials have repeatedly advised Energy that the Consent Decree

5   allowed schedule changes only upon a showing of "good cause."  Fitz Decl.,

6   Exs. 3, 6, 9, 14.  In the State's view, "reasonable diligence" requires Energy to

7   do everything in its power to implement and meet all requirements of the

8   Decree, including proactively addressing technical concerns and aggressively

9   pursuing funding from Congress, internal Energy sources, and any other federal

10  sources. *See, e.g.,* Fitz Decl., Ex. 2.

11       By letter dated June 22, 2012, Energy declined the State's June 13

12  requests.  Fitz Decl., Ex. 8.

13       **2.    August 2012:  State Threatens Formal Action**

14       In light of Energy's response, Washington Governor Christine Gregoire

15  and Washington Attorney General Rob McKenna wrote Energy Secretary

16  Stephen Chu.  *See* Fitz Decl., Ex. 9; Hedges Decl. ¶ 30.  The letter reiterated

17  Washington's requests and informed Energy that the State was considering

18  triggering dispute resolution under the Consent Decree.  Hedges Decl. ¶ 30.  The

19  letter further provided:

20       DOE . . . appears to have already decided it will not comply with
         the Consent Decree based upon self-imposed limitations of
21       (1) annual funding caps and (2) a judgment that resolution of
         technical issues related to the PTF and HLW is only possible if the

22

schedule for those facilities is extended.  It has done so without evaluating whether maintaining compliance remains technically possible, and, if such an evaluation shows that meeting all Consent Decree requirements is not technically possible, without evaluating scenarios geared to still come as close as possible to meeting the current schedule.

Fitz Decl., Ex. 9 at 1.

In mid-September 2012, Secretary Chu contacted Governor Gregoire and committed to become personally involved in the situation.  The Secretary indicated that over the next few months, he would devote substantial personal time and would bring together a panel of noted experts to assist Energy in addressing WTP technical issues.  Hedges Decl. ¶ 32.  He invited State participation in this process.  State officials determined that the Secretary's commitments would suffice as a response to the State's August 29, 2012, letter.[9] Fitz Decl., Ex. 10; Hedges Decl. ¶ 32.  State officials expected the effort to be completed in early 2013.  *See* Fitz Decl., Ex. 11; Hedges Decl. ¶ 33.  State officials expected that upon conclusion of the effort, Energy would propose a new schedule for construction and operation of the WTP.

On January 14, 2013, Secretary Chu sent a letter to Governor Gregoire summarizing the status of the expert panel's efforts and indicating that he had reorganized the local Energy office "to implement the solutions identified

_____

[9] This did not mean the State was foregoing any of its legal options or remedies.  Rather, it meant that the State would defer making any decisions about pursuing formal remedies while the Secretary's process was underway.

WASHINGTON'S PETITION TO AMEND
CONSENT DECREE

25

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
(360) 586-6770

1    through this expert review process." Secretary Chu described work on some of

2    the technical issues as being sufficient to allow Energy to move forward, while

3    more work and testing remained for other issues. Secretary Chu did not identify

4    an expected conclusion date for any of this work, nor did he identify when

5    Energy might propose a new schedule for WTP construction. Hedges Decl. ¶ 34,

6    Ex. 8.

7        Shortly after this letter, Secretary Chu announced he would be leaving

8    office. Hedges Decl. ¶ 35, Ex. 9. In March 2013, the State asked that prior to

9    Secretary Chu's departure, Energy provide a schedule for completing review of

10   all technical issues associated with WTP design. Hedges Decl. ¶ 35, Ex. 10. No

11   schedule was forthcoming. In May 2013, the State informed Energy that it

12   considered any "brainstorming" phase of work to be over and that it expected to

13   receive in the very near future a proposal for resolving technical issues and

14   meeting WTP obligations. Hedges Decl. ¶ 35, Ex. 11. When incoming

15   Secretary Ernest Moniz visited Washington State in June 2013, he committed to

16   Governor Inslee that he would provide a plan for moving forward by the end of

17   summer. Hedges Decl. ¶ 36, Ex. 12.

18       In September 2013, Energy provided its Draft Hanford Tank Waste

19   Retrieval, Treatment, and Disposition Framework document to Washington.

20   Hedges Decl. ¶ 37, Ex. 13. The Framework document described a three-phased

21   start-up of the WTP. Construction and start-up of the Low Activity Waste

22

WASHINGTON'S PETITION TO AMEND
CONSENT DECREE

26

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
(360) 586-6770

1    Facility would occur during phase 1; construction and start-up of the High Level

2    Waste Facility would occur during phase 2; and start-up of the Pretreatment

3    Facility would occur during phase 3.  Hedges Decl. ¶ 37, Ex. 13 at 4–5.  Beyond

4    describing these phases in a conceptual manner, the document provided little

5    detail, contained no schedule for any of the phases, and did not in any way

6    address SST retrievals.  *Id.*  The document's cover letter expressly stated that

7    "the enclosed Framework is not a proposal to amend the Consent Decree."

8    Hedges Decl. ¶ 37, Ex. 14.

9        State officials met with Energy representatives three times between

10   September and December 2013.  Hedges Decl. ¶ 39.  The September and October

11   meetings focused on the draft Framework document and the December meeting

12   was designated as the Three-Year Review meeting called for by the Consent

13   Decree, Section VI.  Hedges Decl. ¶ 39; *see* Consent Decree § VI.  State officials

14   repeatedly asked Energy and Department of Justice representatives for proposals

15   for changes to Consent Decree requirements with justifications for such changes

16   and for a description of how such proposed changes would impact other

17   requirements.  Hedges Decl. ¶ 40.  Between September 2013 and March 2014,

18   Energy did not provide a proposal to change Consent Decree requirements with

19   justifications for such changes nor did Energy describe how a new schedule

20   would impact other requirements like completing waste treatment and retrieval

21   obligations in the HFFACO.  Hedges Decl. ¶ 40.

22

1      Meanwhile, following Energy's November 2011 "at risk" notice, Energy

2   gave the State three more notices that Decree milestones were at risk (June 6,

3   2013, October 8, 2013, and September 22, 2014).  Fitz Decl. ¶¶ 14, 15, 17, Exs.

4   12, 13, 15.  The June 2013 notice identified one Low Activity Waste Facility

5   construction milestone at risk and the October 2013 notice labelled all the

6   remaining Low Activity Waste Facility milestones as at risk.  The June 2013 and

7   September 2014 notices identified SST retrieval milestones at risk, indicating

8   that Energy would not complete retrieval of four of ten SSTs required to be

9   completed by September 30, 2014.  *See id*.  Combined, these four notices mean

10  that 14 of the 16 pending Consent Decree deadlines are at risk, with two past

11  deadlines missed and not yet completed as of the date of this Petition.  Hedges

12  Decl. ¶ 41.

13      **3.    New Tank Issues**

14      In addition to Energy's "at risk" notifications, there have been at least

15  two other significant developments since the entry of the 2010 Decree.  First, in

16  October 2012, Energy disclosed that DST Tank AY-102 has a leak between its

17  inner and outer shells.  This means that one of Hanford's 28 DSTs must now be

18  taken out of service.  Second, in February 2013, Energy disclosed that as many

19  as six SSTs appeared to be actively leaking waste.   As of the date of this

20  Petition, Energy now considers one of these SSTs (Tank T-111) to be actively

21  leaking.

22

WASHINGTON'S PETITION TO AMEND
CONSENT DECREE

28

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
(360) 586-6770

a)      **DST AY-102 Out of Service Due to Internal Leak**

Double-Shell Tank AY-102 was constructed in 1968 as one of Hanford's first DSTs.  It has a capacity of one million gallons and currently contains about 800,000 gallons of hazardous and radioactive sludge and liquid waste.  In its River Protection Project System Plan, Rev. 6, Energy identified this waste to be the first low-activity and high-level waste feeds for the Waste Treatment Plant hot commissioning.  However, in fall of 2012, Energy notified the State of a leak from the underside of AY-102's primary tank into its secondary containment.  Continued monitoring indicates the leak is growing.  There is at least a risk of ultimate breach to the environment.  As identified by the Defense Nuclear Facilities Safety Board, there is also a risk, that the leaked material could eventually clog ventilation channels underneath the tank, a matter of concern because of the high heat generated by the waste.  Lyon Decl. ¶ 21.

Washington's Dangerous Waste Regulations require that the tank and its secondary containment be removed from service, emptied of waste, inspected to determine if it's repairable, and closed if it is not repairable.  40 C.F.R. § 265.196.  Energy is now subject to a settlement agreement with the State to carry out these tasks.  Although Energy has not yet made a determination that the tank cannot be repaired, it is presumed that this will be the conclusion after the tank is emptied and inspected.  As a consequence, Hanford's total DST capacity has been reduced by one million gallons.  Lyon Decl. ¶ 22.

WASHINGTON'S PETITION TO AMEND
CONSENT DECREE

29

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
(360) 586-6770

1

### b)    At Least One SST Identified With Active Leak to Surrounding Soils

2

3          In December 2012, Energy informally reported to the State that it was

4    investigating a possible leak from Tank T-111.  Tank T-111 was built between

5    1943-44 and was put into service in 1945.  It contains 447,000 gallons of

6    sludge, with an interstitial liquid volume of 38,000 gallons (approximately

7    8.5 percent by volume liquid).  It was classified as an "assumed leaker" in 1979

8    and was interim stabilized in 1995.  On February 15, 2013, Energy provided

9    official notice that the waste level in Tank T-111 has decreased, indicating a

10   possible release of tank liquid to surrounding soils.  Energy has indicated that

11   the current rate of loss of liquids from the tank could be in the range of 150 to

12   300 gallons over the course of a year.  A specific cause of the liquid level

13   decrease in Tank T-111 has not been determined.  Lyon Decl. ¶ 17.

14          A week after the Tank T-111 leak was announced, it was announced that

15   five more SSTs appeared to be leaking.  Although Energy has since declared

16   that none of the five are leaking, the State does not consider the evidence

17   conclusive for one of the five, due to monitoring data and an unusual and not

18   well-documented waste surface profile.  Lyon Decl. ¶ 18.

### III.    REASONS FOR THE STATE'S REQUEST FOR RELIEF

19          Reluctantly, the State recognizes that Energy is so far off track on WTP

20   construction that it is impossible to recover and comply with the current

21   schedules under the Decree.  Rather than seeking to sanction Energy, the State

22

WASHINGTON'S PETITION TO AMEND          30          ATTORNEY GENERAL OF WASHINGTON
CONSENT DECREE                                              Ecology Division
                                                                PO Box 40117
                                                         Olympia, WA 98504-0117
                                                             (360) 586-6770

1    believes it is in the better long-term interest of Hanford's tank waste mission to

2    instead seek amendment of the Decree to impose a new, realistic, but

3    achievable, schedule for completing construction of the WTP and bringing the

4    WTP into initial operation; impose requirements to continue retrieving waste

5    from non-compliant SSTs while the WTP is delayed (together with constructing

6    sufficient storage capacity to facilitate these retrievals); and add terms to the

7    Consent Decree to ensure greater accountability and enforceability in light of

8    the circumstances leading to the current state of noncompliance.

9          Two overriding concerns have shaped the State's proposal.  First, events

10   since the Consent Decree was entered demonstrate that the Decree requires

11   more specificity, accountability, and enforceability to avoid a repeat of the

12   current situation.  These terms should be reflected in the framework of the

13   amended schedule itself, as well as in other provisions of the Decree.  Second,

14   to maintain the level of substantive relief provided by the 2010 Decree (i.e.,

15   preserve the "benefit of the bargain"), any Decree amendment should include

16   sufficient mitigation for the WTP delay to keep the tank waste retrieval mission

17   on track despite the delay.  This mitigation is for Energy to retrieve additional

18   waste from SSTs and construct additional DST capacity to facilitate that

19   retrieval.

20

21

22

WASHINGTON'S PETITION TO AMEND
CONSENT DECREE                                           31                    ATTORNEY GENERAL OF WASHINGTON
                                                                                             Ecology Division
                                                                                             PO Box 40117
                                                                                             Olympia, WA 98504-0117
                                                                                             (360) 586-6770

**A.    The Events Since the Consent Decree Was Entered Demonstrate That the Decree Requires More Specificity, Accountability, and Enforceability**

   **1.    Energy's WTP Problems Have Continued Since Entry of the 2010 Consent Decree**

The events since 2010 demonstrate a continuation of the problematic WTP project management patterns demonstrated by Energy prior to entry of the Decree. Once again, numerous federal studies and reports since the Decree was lodged and entered outline a persistent lack of institutional awareness of, or competence toward, project management issues (including contractor review), technical details, and safety design concerns, as well as a lack of consistent affirmative action toward addressing schedule risks. There is a mountain of information on the topic.[10] However, the situation was succinctly summarized by one report that concluded:  "By just about any definition, DOE's WTP project at Hanford has not been a well-planned, well-managed, or well-executed major capital construction project." Dahl Decl. ¶ 43, Ex. 5.

Perhaps most significant to the WTP schedule, Energy has still not resolved issues concerning mixing vessels and piping in the Pretreatment and High Level Waste Facilities; namely, erosion and corrosion in the vessels and related piping, as well as the design adequacy of pulse-jet mixers in the vessels, despite being repeatedly informed of the issues and associated risks by the

---

[10] Again, a more detailed overview of Energy's ten-plus years of WTP failures is provided in the Declaration of Suzanne Dahl, ¶¶ 31-90.

WASHINGTON'S PETITION TO AMEND
CONSENT DECREE

32

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
(360) 586-6770

1    Defense Nuclear Facility Safety Board, and the Government Accountability

2    Office.  Dahl Decl. ¶¶ 54-61, 70-73, 86.  After years of re-designs based on

3    analyses/calculations and small-scale testing with stimulants that were not

4    representative of Hanford tank waste, Energy finally realized in 2012 that it had

5    to go back to square one to do full-scale testing of a mock vessel, then proceed

6    with design.  Full scale testing of the actual WTP vessels prior to installation,

7    however, became cost and schedule prohibitive.  Dahl Decl. ¶¶ 66-72.  Instead,

8    in March 2014, Energy arrived at a new approach: (1) build a characterization

9    and preconditioning facility to pretreat the waste before it goes to the

10   Pretreatment Facility; and (2) use smaller, standard designed and sized vessels,

11   which would be tested at full scale.  Dahl Decl. ¶ 73, Ex. 19.

12        In another example, a critical disconnect has continued between the

13   engineering design of the project—particularly as related to the High Level

14   Waste and Pretreatment Facilities—and the "safety basis" review of that design,

15   which confirms it complies with Energy's own nuclear safety standards.  This

16   disconnect, together with confusion over and inconsistency in applying the

17   standards to be used for the safety basis review, has led to outright project

18   dysfunction.  Although these issues have been present for years, the extent of

19   impact the issues have had on the viability of the project was neither

20   appreciated nor corrected by Energy.  This contributed to Energy halting

21

22

1    construction on both facilities in 2012, with construction yet to resume.  One

2    report summarized the situation as follows:

3           The information from multiple sources, . . . point to safety culture
            issues with personnel who are directly involved in the design and
4           engineering functions and the nuclear safety basis analysis and
            review functions. . . . As examples: there are inconsistencies
5           between contractual documents (e.g., safety basis review
            procedures) and regulatory requirements; and DOE-STD-3009 was
6           not consistently applied over the years, so part of the existing
            safety basis documents and some aspects of the design may not
7           comply with DOE-STD-3009 and 10 CFR 830, impacting the
            ability to gain approval of the final [Documented Safety Analysis].
8           In addition, [Preliminary Documented Safety Analyses, or PDSAs]
            are out of date, and various reviews have highlighted significant
9           deficiencies in PDSAs and safety basis processes in general. . . .

10          The above factors and other conditions . . . have contributed to a
            situation where there is often severe tension and frequent
11          animosity within and between personnel with nuclear safety design
            and safety basis responsibilities. . . . With the factors described
12          above, neither [engineering design nor safety basis] organization
            has performed their responsibilities effectively; technical questions
13          and differing opinions have not been effectively resolved because
            the requirements are conflicting or not commonly understood, the
14          procedures do not match the requirements, the previous analyses
            (e.g., PDSAs) are not reliable, and the safety basis organization is
15          understaffed . . . .

16          *Most of the above factors have been in place for ten years*.
            However, until the past few years, it appears that safety basis
17          documents were often not reviewed by the [safety basis]
            organization and ORP against the requirements of DOE-STD-
18          3009. . . . The situation has become increasingly worse as the
            WTP design has progressed, the PDSA has become further out of
19          date, and the delays in safety reviews of design and engineering
            documents have become longer. . . .

20
            *[M]ost of the contributing factors listed above result from actions*
21          *or inactions at higher levels of ORP, DOE-WTP, and BNI*
            *management.  ORP, DOE-WTP, and BNI management has not*

22

1     *achieved timely resolution of important issues, including those discussed above; in some cases, issues have remained unresolved*

2     *for about ten years.*

3     Dahl Decl. ¶ 42, Ex. 4 at vii-viii (emphasis added).

4         In a further example, it became apparent that Energy and its contractor

5 had failed to document compliance with quality assurance standards for the

6 "black cell" mixing vessels in the High Level Waste and Pretreatment

7 Facilities—the same vessels subject to ongoing erosion and corrosion concerns.

8 Again, Energy had earlier failed to appreciate or correct the problem:

9     The Office of Inspector General received allegations concerning aspects of the quality assurance program at the Department of

10     Energy's $12.2 billion Waste Treatment and Immobilization Plant (WTP) project in Hanford, Washington. . . .

11

12     In brief, it was alleged that quality assurance records for the critically important "black cell" waste processing vessels were not traceable to work performed. . . .

13

14     *Our review substantiated the allegation. In short, we found that the Department had procured and installed vessels in WTP that did*

15     *not always meet quality assurance and/or contract requirements. . . . The importance of black cells and hard-to-reach*

16     *components cannot be overstated. Premature failure of these components could potentially impact safety, contaminate large*

17     *portions of a multi-billion dollar facility and interrupt waste processing for an unknown period of time. . . .*

18     The matters discussed in this report come at a time when concerns about safety at WTP have been raised and the Department is

19     working to ensure a proactive safety culture at WTP. . . . While these actions are encouraging, *we are concerned that the prior*

20     *reviews performed by Bechtel and the Department failed to fully identify the extent of the problems with the missing or incomplete*

21

22

WASHINGTON'S PETITION TO AMEND      35      ATTORNEY GENERAL OF WASHINGTON
CONSENT DECREE                         Ecology Division
                                                       PO Box 40117
                                              Olympia, WA 98504-0117
                                              (360) 586-6770

1    *quality assurance documents, and that weaknesses in oversight
     still exist.*

2    Dahl Decl. ¶ 45, Ex. 6 at Summary Memorandum 1-3 (emphasis added).[11]

3        In yet another example, Energy has continued to demonstrate a tendency

4    to push back near-term work and planning; what in colloquial terms can be

5    called "kicking the can down the road."  Prophetically, a 2011 report warned

6    that this practice sets the stage for future delays of even greater magnitude and

7    cost:

8
         With respect to schedule performance, the Committee found that
9        between January and July 2011, nearly 7% of the remaining to-go
         schedule activities (1,260 activities out of 18,620 activities) were
10       moved out to later dates. . . .

11       The [C]ommittee has a concern about this practice of moving out
         of the near-term window (3-6 months) work that cannot or will not
12       be accomplished, namely, that a "bow-wave" of work will begin to
         accumulate in the remaining period of performance.  *When this*
13       *bow wave of work can no longer be moved to a later period, the*
         *amount of critical and near-critical activities rise, [and] the risk*
14       *that these activities cannot be accomplished on schedule and on*

15   _____

16       [11] Similar audit findings were made in 2013 with respect to Bechtel's

17   broader design control documentation, with the audit alleging that the problems

18   had "led to the creation of major design vulnerabilities."  *See* Dahl Decl. ¶ 46,

19   Ex. 7 at 2-3.  The audit further concluded:  "Although management reported

20   that it had resolved the specific issues discussed in these reports, our most

21   recent work demonstrates that additional attention to quality assurance is

22   necessary."  *Id*. at 3.

1    *budget will also rise due to trade stacking, craft labor availability,
     and greater impacts associated with material or engineering holds*.

2    Dahl Decl. ¶ 41, Ex. 3 at 48 (emphasis added).

3
         2.    **The Events Since Entry of the 2010 Consent Decree Show Gaps
4              in the Decree's Terms**

5              This situation, together with the manner in which Energy has interacted

6    with the State and responded under the Consent Decree, has exposed four gaps

7    in the Decree's terms.   First, structurally, the 2010 Consent Decree afforded

8    Energy considerable leeway in how it satisfied the Decree's requirements.   For

9    instance, rather than including detailed interim milestones by which to measure

10   progress, Energy prevailed upon the State to accept fewer, more general

11   milestones in order to allow Energy greater flexibility in delivering the ultimate

12   results required under the Decree.   Thus, Appendix A to the Decree includes

13   only 19 milestones for the entire WTP project (compared to the more than

14   18,600 schedule activities cited above), with only four rather general

15   construction milestones in the span of eight years for the technically challenged

16   Pretreatment Facility:

17      • Complete Structural Steel Erection Below Elevation 56' in PT Facility
          (12/31/2009)
18      • Complete Elevation 98' Concrete Floor Slab Placements in PT
          Facility (12/31/2014)
19      • Complete Installation of Pretreatment Feed Separation Vessels FEP-
          SEP-00001A/1B (12/31/2015)
20      • PT Facility Construction Substantially Complete (12/31/2017)

21   Consent Decree, Appendix A, Milestones A-18, A-19, A-13, A-14.

22

WASHINGTON'S PETITION TO AMEND         37        ATTORNEY GENERAL OF WASHINGTON
CONSENT DECREE                                             Ecology Division
                                                           PO Box 40117
                                                      Olympia, WA 98504-0117
                                                          (360) 586-6770

1    Similarly, the Decree defined only three general construction milestones

2    in the span of six years for the technically challenged High Level Waste

3    Facility:

4      • Complete Construction of Structural Steel to Elevation 14' in HLW
         Facility (12/31/2010)

5      • Complete Construction of Structural Steel to Elevation 37' in HLW
         Facility (12/31/2012)

6      • HLW Facility Construction Substantially Complete (12/31/2016)

7    Consent Decree, Appendix A, Milestones A-20, A-21, A-2.

8    The State accommodated Energy's request for these limited and general

9    milestones based on the State's underlying assumption that, faced with having

10   to comply with a court order, Energy would be motivated to correct past WTP

11   project management difficulties and make every effort to comply with the

12   Decree's mandate to create a functioning WTP.  In retrospect, these milestones

13   were too limited in number, too general, and too separated in time to ensure that

14   the Decree effectively shapes Energy's approach to the WTP and measures

15   Energy's progress before any slips become too great.  This is particularly

16   important as the parties move forward, since both the State and Energy agree

17   that a "phased" approach to completing the WTP is appropriate in which the

18   Low Activity Waste Facility is constructed and begins operating ahead of the

19   other WTP facilities.  Energy has been criticized in its development of the

20   phased approach for not developing a sufficiently detailed analysis of all the

21

22

1   actions and costs incumbent with the approach.  *See* Dahl Decl. ¶ 93, Ex. 32 at

2   2-5.

3       Second, the 2010 Consent Decree contains no reporting requirements to

4   the Court.  Instead, it contains requirements to provide the State with a written

5   monthly "summary report," *see* Decree § IV.C.2, and more comprehensive

6   semi-annual reports, *see* Decree § IV.C.1, both of which are to document

7   Energy's progress and compliance status under the Decree.

8       In theory, these reports should be a key accountability measure under the

9   Decree, obliging Energy to keep the State timely informed of its progress.  In

10  practice, these reports failed to provide the State with timely notice of Energy's

11  WTP schedule problems.  Indeed, in the months leading up to Energy's

12  November 2011 notice of "at risk" milestones, Energy's quarterly reports gave

13  no indication of looming long-term schedule issues.  *See* Hedges Decl. ¶ 25,

14  Ex. 5.

15      Further confounding the utility of these reports, Energy and the

16  Department of Justice have insisted on characterizing communications

17  concerning milestones "at risk," and describing the steps Energy might take to

18  avoid missing Decree deadlines, as "settlement" communications subject to

19  Federal Rule of Evidence 408.  In the case of Energy's November 2011 notice,

20  this led to more than five months of delay before Energy even met with the State

21  to identify the specific Decree milestones at issue, as well as discuss its actions in

22

WASHINGTON'S PETITION TO AMEND
CONSENT DECREE                                    39                    ATTORNEY GENERAL OF WASHINGTON
                                                                          Ecology Division
                                                                          PO Box 40117
                                                                          Olympia, WA 98504-0117
                                                                          (360) 586-6770

1    response to the circumstances.  Once Energy itself determined it was going to

2    miss Decree milestones, it effectively set off on its own course without involving

3    the State or the Court.  As the State wrote to Energy in April 2012, before the

4    parties finally met to discuss Energy's November 2011 notice:

> State officials are seriously troubled by the fact that more than four
> months have passed and yet DOE has failed to describe to the state
> the information that leads DOE to believe certain requirements of
> the Decree may be at risk of being missed, and the steps that DOE is
> taking to avoid missing Decree deadlines.  Equally as troubling are
> the numerous public statements by DOE officials and their
> contractors suggesting to us that DOE may be proceeding forward
> as if [DOE] is not bound by the court's Decree and is able to
> unilaterally establish a new set of requirements and schedule.

10    Fitz Decl., Ex. 5.

11    Third, the last point above highlights an additional "accountability" gap

12    in the 2010 Decree.  The Decree contains no express requirement to, as soon as

13    schedule risks are identified, create and submit for Court approval a recovery

14    plan to maintain compliance with, or come as close as possible to maintaining

15    compliance with, those requirements of the Consent Decree that are at risk.

16    As indicated above, since receiving initial notice in 2011, the State has

17    consistently maintained that the "good cause" provisions for amending the

18    Decree require Energy to do everything within its power to meet the legal

19    obligations in the Consent Decree by exercising reasonable diligence to identify

20    and respond to technical issues, performing effective project management,

21    exercising strong oversight of its contractors, and seeking sufficient funds or

22

WASHINGTON'S PETITION TO AMEND
CONSENT DECREE

40

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
(360) 586-6770

1    reprogramming funds to meet its obligations.  In May 2012, after learning

2    Energy had tasked its contractor with creating a new WTP baseline with

3    presumed delays and budget limitations, the State sent Energy a letter asking it

4    to have its contractor develop an alternate "unconstrained" baseline intended to

5    maintain as closely as possible compliance with the Decree.  Fitz Decl., Ex. 6.

6    Energy declined the State's request.  Fitz Decl., Ex. 8.

7        By September 2013, the State had still not received any submission from

8    Energy concerning how it proposed to move forward with the WTP project,

9    despite Energy taking action on its own, outside the Decree, to move forward in

10   a new direction.   By the time Energy submitted its draft "Framework

11   Document" to Ecology, Energy had already substantially committed to this new

12   direction by giving its contractor direction to proceed with planning for Direct

13   Feed Low Activity Waste.  Hedges Decl. ¶ 38.  For two-and-one-half years

14   after Energy first notified the State that it could not likely meet the current

15   court-ordered schedule, the State waited for Energy to engage it and the Court

16   with how it plans to rectify its noncompliance.  Without an express requirement

17   for such engagement, however, Energy effectively defined a new direction

18   without State and Court approval.

19       Fourth, Energy has cited funding issues (both past restrictions and

20   projected future shortfalls) as part of the reason it cannot meet Consent Decree

21   requirements.   Hedges Decl. ¶¶ 27, 29.   The State believes included in the

22

1  Consent Decree obligation to exercise reasonable diligence is an obligation on

2  Energy's part to do everything within its power to seek sufficient funds

3  (through appropriation requests and through reprogramming funds from other

4  sources) to comply with Consent Decree obligations. *See, e.g.*, Fitz Decl.,

5  Ex. 2. Yet, when describing how funding may impact its ability to meet court-

6  imposed deadlines, Energy has provided unclear and unspecific information.

7  Hedges Decl. ¶ 29. This means the State is unable to assess the role of funding

8  and whether the situation is within or beyond Energy's control. In order for the

9  State and the Court to be able to evaluate this issue in the future, Energy should

10 be required to periodically show the Court and the State what it views as a

11 compliant budget. Thus, the State's requested relief seeks an annual report to

12 the Court wherein Energy will describe upcoming funding needs for meeting all

13 requirements in the Consent Decree.

14 **B. The Consent Decree Must Include Mitigation for WTP Delays in**
   **Order to Maintain the Benefit of the Bargain Provided by the 2010**
15 **Decree**

16 As indicated above, the balance struck in the parties' 2010 settlement was

17 to: (1) place requirements in the Consent Decree specifying that the WTP

18 would be operational by 2022, with 19 SSTs retrieved by the same date; and

19 (2) commit new dates for all remaining tank waste mission tasks—which

20 include retrieving waste from all remaining SSTs and completing the treatment

21 of all tank waste—to the HFFACO. The HFFACO milestones for these tasks,

22

WASHINGTON'S PETITION TO AMEND
CONSENT DECREE

42

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
(360) 586-6770

1    however, were based on the key premise that Energy would comply with the

2    Consent Decree.  In particular, having the WTP achieve "initial operations" by

3    2022 was a key basis for completing all SST retrievals by no later than

4    December 31, 2040, and completing all tank waste treatment by no later than

5    December 31, 2047.  At the time the 2010 settlement was executed, the Parties

6    indicated that the pace of retrievals would reach "about 6-7 tanks per year by the

7    early 2020s" based on the expectation that the WTP would achieve "initial

8    operations" status by 2022.  Lyon Decl. ¶ 31.

9           Without mitigation, the current and future delays in achieving full WTP

10    operations will set back the SST retrieval and tank waste treatment missions.

11    Due to limited current available capacity in the DST system (recently reduced

12    one million gallons due to the leak in DST Tank AY-102), Energy cannot

13    maintain retrievals under the current retrieval compliance schedule.  Lyon Decl.

14    ¶¶ 23-34.  At the same time, completing the SST retrieval mission on the

15    current HFFACO schedule is more essential than ever.  As Energy itself has

16    concluded, the long-term leak integrity of any SST "cannot be proven."  Lyon

17    Decl. ¶ 10, Ex. 3.  It is indisputable, however, that the likelihood of further

18    deterioration and leakage will only increase as time passes.  Lyon Decl. ¶ 10.  In

19    the past two years, there is evidence of at least one newly active leaking SST

20    (Tank T-111), with the possibility that more SSTs may be also actively leaking.

21    Lyon Decl. ¶¶ 17-18.  Delays in waste retrieval today will only make further

22

WASHINGTON'S PETITION TO AMEND
CONSENT DECREE

43

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
(360) 586-6770

1  retrieval more difficult, costly, and risky due to changes in the waste forms

2  within the tanks, as well as the increased possibility that tanks may leak during

3  the process of retrieval.  Lyon Decl. ¶ 10.

4       To mitigate for Energy's WTP delays and keep the waste retrieval

5  mission on track, the Decree should include requirements to retrieve additional

6  waste from SSTs.  However, no further significant transfer of waste can occur

7  without first either reducing the volume of waste currently in the DST system

8  through treatment, or by increasing the storage capacity of the DST system by

9  building more DSTs.  Lyon Decl. ¶¶ 24, 30.  Because even under the State's

10  proposed schedule, the WTP will not reach full-scale "initial operations" until

11  2031, the Decree should also include requirements to build additional DST

12  capacity.

13       **IV.   REQUEST FOR RELIEF**

14  **A.   Amendment Process Under the Consent Decree**

15       Generally, the schedules in the Consent Decree may only be amended if:

16  (1) a request for amendment is timely; and (2) good cause exists for the

17  amendment.  Section X.C of the Decree, however, provides that:

18       Notwithstanding any other provision of this Decree, the State
     reserves the right to (1) seek amendment of this Decree, if

19       previously unknown information is received, or previously
     undetected conditions are discovered, and these previously

20       unknown conditions or information together with any other
     relevant information indicates that the work to be performed and

21

22

WASHINGTON'S PETITION TO AMEND        44        ATTORNEY GENERAL OF WASHINGTON
CONSENT DECREE                               Ecology Division
                                                     PO Box 40117
                                           Olympia, WA 98504-0117
                                                (360) 586-6770

1        schedule under this Decree are not protective of human health or
the environment . . . .

2   Consent Decree § X.C.

3        Here, Energy's failure to comply with the schedule for constructing and

4  achieving initial operations of the WTP; the magnitude of Energy's continuing

5  pattern of project management difficulties; the fact that a DST now must be

6  taken out of service (thus further diminishing available capacity in the DST

7  system); and evidence that at least one SST is actively leaking, together

8  constitute "previously unknown information . . . or previously undetected

9  conditions" that indicate that the present schedule and terms of the Decree "are

10  not protective of human health or the environment."

11      Consent Decree Section VII sets out the process for amending the

12  Decree. In short, the party proposing an amendment must provide the proposal

13  in writing to the other party. Consent Decree § VII.A.1. The receiving party

14  then has 10 working days to notify the proposing party whether or not the

15  amendment is acceptable. *Id*. If the receiving party determines that the

16  amendment is not acceptable, it must notify the proposing party in writing of its

17  reasons for disagreement. In that event, the proposing party may invoke the

18  Decree's dispute resolution process. Consent Decree § VII.A.3.

19      The Decree's dispute resolution process requires that the parties

20  "endeavor to settle [the dispute] by good faith negotiations among themselves."

21  Consent Decree § IX.A. If the parties cannot resolve the issue "within a

22

WASHINGTON'S PETITION TO AMEND
CONSENT DECREE

45

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
(360) 586-6770

1    reasonable time, not to exceed forty (40) calendar days from the date of the

2    written demand for good faith negotiations," then either party may seek

3    appropriate relief from the Court pursuant to Consent Decree Section IX.B.  *Id.*

4    That Section provides:

5        If the dispute is not resolved within 40 days from the date of the
    written demand for good faith negotiations of the dispute, either

6        party may petition the Court for relief.  A petition seeking
    appropriate relief from the Court shall be filed within thirty (30)

7        calendar days of the end of the 40-day period provided for in
    Section IX-A.  The Court shall resolve any such disputes under a

8        de novo standard of review.

9    Consent Decree § IX.B.

10       Here, the State submitted its amendment proposal to Energy on

11   March 31, 2014.  On April 18, 2014, Energy timely rejected the State's

12   amendment.[12]   On April 25, 2014, the State triggered the 40-day dispute

13   resolution period, which was twice extended by this Court.  Despite both parties

14   working in good faith, the State and Energy were unable to resolve their dispute

15   during this extended dispute resolution period.  This petition is timely brought

16   within 30 days of the conclusion of the extended dispute resolution period.

17

18

19   _____

20       [12] Upon mutual agreement, and as allowed by Consent Decree Section

21   VII.A.4, the parties extended the 10-day timeline for responding to an

22   amendment proposal.

WASHINGTON'S PETITION TO AMEND
CONSENT DECREE

46

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
(360) 586-6770

**B.    Legal Standard for Consent Decree Amendment**

Courts have authority to enforce and modify consent decrees.   A court "may interpret and enforce a decree to the extent authorized either by the decree or by the related order." *Pigford v. Veneman*, 292 F.3d 918, 923 (D.D.C. 2002). Courts also have the inherent authority to modify a decree entered by an order of the court.   This authority is codified in Federal Rule of Civil Procedure 60(b). *Bellevue Manor Assocs. v. United States*, 165 F.3d 1249, 1252 (9th Cir. 1999).

Under Federal Rule of Civil Procedure 60(b)(5), a party to a consent decree may obtain relief from a court when it "is no longer equitable" that the judgment should have prospective application.   Fed. R. Civ. P. 60(b)(5).   It is within the court's discretion to grant or deny relief under Rule 60(b).   *Lasky v. Continental Products Corp.,* 804 F.2d 250, 256 (3d Cir. 1986).

To obtain modification under Federal Rule of Civil Procedure 60(b)(5), a moving party must satisfy the initial burden of establishing a significant change in circumstances that warrant modification, *Rufo v. Inmates of Suffolk Cnty. Jail,* 502 U.S. 367, 383 (1992), and do so by a preponderance of the evidence. *Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 673 F.3d 192, 202 (3d Cir. 2012).   The proposed modification must also be "suitably tailored to the changed circumstances." *Bellevue Manor Assocs.*, 165 F.3d at 1255 (adopting the *Rufo* standard for modifications under Rule 60(b)(5)).   In determining whether modification to a decree is so tailored, the court should consider

47

1    whether the modification "resolve[s] the problems created by the change in

2    circumstances," but "should do no more." *Rufo*, 502 U.S. at 391.  Courts have

3    held that a modification is suitably tailored when the decree is modified "no

4    more than was necessary to approximate the positions the parties would have

5    occupied had the [noncomplying party] lived up to their obligations under the

6    Consent Decree" *Thompson v. United States HUD,* 404 F.3d 821, 832 (4th Cir.

7    2005).

8         Factual changes in circumstances, such as unexpected noncompliance by

9    one of the parties to a consent decree, can serve as a basis for modification.  In

10   *Thompson v. United States HUD*, the Fourth Circuit found that the district court

11   did not abuse its discretion by finding that the moving party did not anticipate

12   the magnitude of a party's failure to comply with the terms of the consent

13   decree.  *Thompson,* 404 F.3d at 828; *see also David C. v. Leavitt,* 242 F.3d

14   1206, 1213 (10th Cir. 2001).  The Fourth Circuit additionally found that the

15   district court did not abuse its discretion when it concluded that the

16   noncompliance amounted to a significant change in circumstances warranting

17   modification of the decree.  *Thompson*, 404 F.3d at 828.  As outlined in pages

18   21 through 31, *supra*, in this case there is both significant noncompliance with

19   terms of the Decree and significant new circumstances that have arisen since

20   the Decree was entered.

21

22

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
(360) 586-6770

1          The State requests that the Court resolve the State's dispute with Energy

2     by adopting as terms into the Consent Decree those portions of the State's

3     proposal identified below.  Under the terms of Section X.C of the Decree, the

4     State has proposed an amendment that: (1) addresses Energy's current

5     noncompliance through a new schedule for completing the WTP that is realistic

6     and achievable, with sufficient specificity to foster accountability and timely

7     identify schedule issues; (2) to maintain the same level of substantive relief

8     (benefit of the bargain) afforded by the 2010 Decree, includes the requirements

9     that Energy continue retrieving waste from non-compliant SSTs while the WTP

10    is delayed, as well as construct additional compliant tank storage capacity to

11    facilitate this retrieval; and (3) includes terms to ensure greater accountability

12    and enforceability in the Decree, in light of the circumstances that led to

13    Energy's current state of noncompliance.   As framed below, the State's

14    amendment "resolve[s] the problems created by the change in circumstances"

15    and "[does] no more."  *See Rufo*, 502 U.S. at 391.  The terms below are suitably

16    tailored to do "no more than was necessary to approximate the positions the

17    parties would have occupied had the [noncomplying party] lived up to their

18    obligations under the Consent Decree."  *See Thompson*, 404 F.3d at 832.  Put

19    another way, the terms preserve the benefit of the bargain of the 2010 Decree.

20    As such, the terms should be adopted into the Decree by the Court.

21

22

**C.    Portions of the State's March 31, 2014 Amendment Proposal That Should be Adopted Into the Consent Decree**

Based on the above, the State respectfully requests that the Court make the following amendments to the Consent Decree.    All of the requested amendments either directly reflect terms of the State's March 31, 2014, amendment proposal to Energy, or reflect a lesser scope of relief that is subsumed within the terms of the State's March 31 amendment proposal.

**1.    New WTP Schedule**

Revised Exhibit A provides a detailed schedule for all portions of the WTP, including new facilities and processes necessary to carry out the "phased" approach to completing construction and start-up of the WTP.  *See* Proposed Order, Revised Exhibit A.  Revised Exhibit A replaces the current Appendix A in the 2010 Consent Decree.  All of the facilities and processes identified in Revised Exhibit A must be constructed and brought to full operation in order for WTP to treat Hanford's tank waste.

The State developed Revised Exhibit A recognizing that delays in the current Consent Decree schedule are unavoidable.  The State seeks to replace the current Appendix A with a schedule that is aggressive, but technically possible.  Still, the resulting changes are significant.  For the Low Activity Waste Facility (which does not present significant unresolved technical issues), the delay in hot start would be three years from the current 2019 deadline for hot start of the entire WTP, with a two-year delay in achieving full-scale initial

WASHINGTON'S PETITION TO AMEND
CONSENT DECREE

50

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
(360) 586-6770

1  operations.  The delays for the other major facilities are longer: for the High

2  Level Waste Facility, hot start is delayed seven years and operations is delayed

3  five years.  Finally, for the Pretreatment Facility and the full WTP, hot start is

4  delayed ten years and initial operations are delayed nine years.  The attached

5  Declaration of Suzanne Dahl provides a detailed description of the assumptions

6  and rationale behind the proposed schedule.  *See* Dahl Decl. ¶¶ 94-139.

7      **2.    Continued SST Retrievals**

8      Exhibit D is a new exhibit to the Consent Decree that, during the period

9  of extended WTP delay (2022-2031 under Revised Exhibit A), provides

10  requirements and deadlines for Energy to continue retrieving waste from SSTs.

11  *See* Proposed Order, Exhibit D.  Following the standard of doing "no more than

12  [is] necessary to approximate the positions the parties would have occupied had

13  the [noncomplying party] lived up to their obligations under the decree,"

14  *Thompson*, 404 F.3d at 832, Exhibit D requires Energy to retrieve waste from

15  the SSTs at a pace on track to meet the HFFACO's "no later than 2040"

16  deadline, just as if Energy had complied with the Decree's terms to begin

17  operating the WTP in 2019 and reach full-scale "initial operations" in 2022.

18      After the retrievals remaining under the current Consent Decree,

19  Appendix B, are completed no later than September 30, 2022 (and retrieval of

20  Tank 241-A103 is completed under HFFACO milestone M-045-15 by the same

21  date), there should be approximately 27 million gallons of waste remaining in

22

WASHINGTON'S PETITION TO AMEND
CONSENT DECREE
51
ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
(360) 586-6770

1   the SST system, with 18 years and three months left before the HFFACO's

2   deadline to complete all SST retrievals.  Lyon Decl. ¶ 23.  Assuming a roughly

3   equal measure of SST waste is retrieved each year, this means Energy must

4   remove at least 13 million gallons of waste by September 30, 2031 (the date

5   proposed in Revised Exhibit A for achieving full WTP "initial operations") in

6   order to remain on pace to meet the HFFACO deadline.  *Id*.  Exhibit D is based

7   on this assumption, requiring Energy to reduce the total volume of waste in the

8   SSTs to no more than 14 million gallons by September 30, 2031, with

9   intermediate pacing requirements.  *See* Proposed Order, Exhibit D.

10          As matters now stand, no further significant transfer of waste can occur

11   without first either reducing the volume of waste in the DST system through

12   treatment, or increasing the storage capacity of the DST system by building

13   more DSTs.  Lyon Decl. ¶¶ 24.  The State has evaluated Energy's projected

14   DST waste volume in 2022 (approximately 24 million gallons), the amount of

15   DST space projected to be available to be filled by more SST waste in 2022

16   (approximately 4.8 million gallons), the amount of additional DST capacity

17   projected to be created by operation of Direct Feed Low Activity Waste Facility

18   operation between 2024 (the start of Direct Feed Low Activity Waste Facility

19   "initial operations") and 2031 (approximately 11.9 million gallons), the amount

20   of waste needing to be retrieved from SSTs during the 2022-2031 period under

21   Exhibit D (approximately 13 million gallons), and the factor by which the

22

WASHINGTON'S PETITION TO AMEND
CONSENT DECREE                                    52                ATTORNEY GENERAL OF WASHINGTON
                                                                                     Ecology Division
                                                                                     PO Box 40117
                                                                                Olympia, WA 98504-0117
                                                                                     (360) 586-6770

1   amount of SST waste "grows" during retrieval due to the introduction of liquid

2   to support retrieval, followed by some reduction of that volume through

3   evaporation processes (a factor of 2.23, which means that retrieving 13 million

4   gallons of SST waste results in a net increase in the volume of waste needing

5   storage to approximately 29 million gallons).  *See* Lyon Decl. ¶¶ 24-30, 33-38.

6   If this is viewed in terms of balancing two sides of a ledger, the State concludes

7   that while 16.7 million gallons of available DST space can be projected during

8   the period from 2022-2031 (approximately 4.8 million gallons of starting space

9   plus approximately 11.9 gallons of space created through DFLAW operation),

10   there will be approximately 29 million gallons of SST waste needing storage in

11   the DST system during the same period.  This results in a net DST space deficit

12   of approximately 12 million gallons during the period.  Lyon Decl. ¶ 37.

13        This 12 million gallon space deficit must be addressed for Energy to be

14   able to reduce the total volume of waste in the SSTs to no more than 14 million

15   gallons by September 30, 2031.  The clearest way to address the deficit is to

16   build additional DST capacity.  Exhibit D thus requires Energy to add DST

17   capacity in a phased manner.  Under the schedule, Energy must design,

18   construct, and bring into operation four million gallons of new DST capacity by

19   2022.  *See* Proposed Order, Exhibit D, milestones D-4 through D-9.  To address

20   the remaining eight million gallons of space deficit, the State has designed

21   Exhibit D to provide Energy the flexibility of showing in two phases that it can

22

WASHINGTON'S PETITION TO AMEND
CONSENT DECREE

53

ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
(360) 586-6770

1    create DST space or otherwise accommodate the volume of SST waste coming

2    into the DST system through means other than constructing additional DST

3    capacity, with the default of building additional DST capacity if this showing

4    cannot be made. *See* Proposed Order, Exhibit D, milestones D-10 through

5    D-14.

### 3.    Additional Accountability Measures

7    As described in pages 31 through 41, *supra*, the events since the 2010

8    Consent Decree was entered demonstrate a need for more specificity,

9    accountability, and enforceability in the Decree. Some of these measures are

10    reflected in the new WTP schedule in Revised Exhibit A, which provides more

11    detailed and comprehensive project deadlines than the 2010 Decree. However,

12    the need for further accountability measures is shown by the manner in which

13    Energy's WTP project came off the rails within 13 months of the Consent

14    Decree's entry. Energy provided no clue of the magnitude of pending schedule

15    issues in its reporting under the 2010 Decree. Prolonged gaps in Energy's

16    communication with the State followed. When Energy did communicate with

17    the State, it came with argument over whether the communications would be

18    subject to Federal Rule of Evidence 408 and with few details provided

19    (including with respect to the significance of funding issues in delay). The

20    State waited some two-and-one-half years after Energy's initial "at risk" notice

21    and invited Energy to propose a Consent Decree amendment addressing the

22

WASHINGTON'S PETITION TO AMEND    54    ATTORNEY GENERAL OF WASHINGTON
CONSENT DECREE    Ecology Division
PO Box 40117
Olympia, WA 98504-0117
(360) 586-6770

1    situation, without response.  In the meantime, Energy effectively set off on its

2    own course without involving the State or the Court.  In the end, the State

3    finally had to initiate its own amendment proposal, which is now before the

4    Court.

5         The State's Proposed Order includes amendment to three terms of the

6    2010 Consent Decree to address these circumstances.  The first is a requirement

7    to submit quarterly status reports to both the State and the Court, with

8    requirements to provide a planning report for the upcoming quarter, address

9    project successes and failures over the past quarter, disclose any emerging

10   technical issues, describe any procurement issues, and track progress toward

11   Consent Decree milestone compliance.  *See* Proposed Order.

12        The second is a proposed new Section IV.E to the Consent Decree.  This

13   section requires Energy to timely inform the State and the Court of a milestone

14   "at risk" situation and calls for Energy to, in conjunction with any milestone "at

15   risk" notification, timely inform the State and the Court of Energy's plan for

16   addressing the situation, together with a proposed schedule of recovery actions.

17   *Id*.

18        Finally, the third measure is a proposed new Section VIII.B to the

19   Consent Decree.  This section requires Energy to annually by March 1, disclose

20   to the State and the Court the total funding needed to achieve compliance with

21

22

1  all requirements of the Consent Decree for each of the upcoming seven federal

2  fiscal years.

3      These terms are necessary to help avoid yet another repeat of the current

4  situation.  Together, the terms ensure greater accountability and enforceability

5  in the Decree in light of the circumstances leading to the current state of

6  noncompliance.

7                              **V.    CONCLUSION**

8      Based on the foregoing, the State respectfully requests that the Court

9  adopt into the Consent Decree the elements of the State's March 31, 2014

10  amendment proposal described above.

11      DATED this 3rd day of October, 2014.

12                          ROBERT W. FERGUSON
                          Attorney General
13
                          *s/ Andrew A. Fitz*
14                          MARY SUE WILSON, WSBA #19257
                          Sr. Assistant Attorney General
15                          ANDREW A. FITZ, WSBA #22169
                          Senior Counsel
16                          LEE OVERTON, WSBA #38055
                          DOROTHY H. JAFFE, WSBA #34148
17                          Assistant Attorneys General
                          Attorneys for Plaintiff
18                          State of Washington
                          Office of the Attorney General
19                          P.O. Box 40117, Olympia, WA 98504-0117
                          (360) 586-6770
20                          marysuew@atg.wa.gov
                          andyf@atg.wa.gov
21                          leeo1@atg.wa.gov
                          dorij@atg.wa.gov
22

1

**PROOF OF SERVICE**

2      I certify that I electronically filed the foregoing document with the Clerk

3 of the U.S. District Court using the CM/ECF system which will send

4 notification of such filing to all parties of record as follows:

5
- **Amanda Shafer Berman**
6  amanda.berman@usdoj.gov
- **Roger J DeHoog**
7  roger.dehoog@doj.state.or.us
- **Andrew A Fitz**
8  andyf@atg.wa.gov,daniellef@atg.wa.gov,ecyolyef@atg.wa.gov
- **David Kaplan**
9  david.kaplan@usdoj.gov
- **Cynthia J Morris**
10  c.j.morris@usdoj.gov,EFILE_EDS.ENRD@USDOJ.GOV
- **Stephanie Marie Parent**
11  stephanie.m.parent@doj.state.or.us,Rhonda.K.Gearheart@doj.state.or.
12  us,Toni.C.Kemple@doj.state.or.us
- **Mary Sue Wilson**
13  marysuew@atg.wa.gov,ecyolyef@atg.wa.gov

14
DATED this 3rd day of October, 2014.
15

16
*s/ Andrew A. Fitz*
17  MARY SUE WILSON, WSBA #19257
ANDREW A. FITZ, WSBA #22169

18

19

20

21

22

WASHINGTON'S PETITION TO AMEND
CONSENT DECREE                    57    ATTORNEY GENERAL OF WASHINGTON
Ecology Division
PO Box 40117
Olympia, WA 98504-0117
(360) 586-6770